**Karl Isac Joel ROSEN, AB Iro**

v.

**LAWSON–HEMPHILL, INC.**
**Civ. A. No. 5362.**

United States District Court,
D. Rhode Island.
July 24, 1975.

Addendum July 29, 1975.

As Corrected Aug. 6, 1975.

Patent No. 3,648,939 granted March 14, 1972 for a "yarn storing device"[1] and seeks an injunction and an accounting. The defense is predicated on non-validity, non-infringement, and patent misuse.

Jurisdiction of the Court is based on 28 U.S.C. § 1338(a).

Karl Isac Joel Rosen is a citizen of Sweden and the inventor of the patent in suit. AB Iro, co-owner of the patent,[2] is a manufacturing company located in Sweden engaged in the business of manufacturing and selling yarn feeding mechanisms in Europe and the United States.

The defendant is a Rhode Island corporation with its principal place of business in Central Falls, Rhode Island.

Elliot A. Salter, of Salter & Michaelson, Providence, R. I., Richard G. Lione, James P. Hume and Charles E. Quarton of Hume, Clement, Brinks, Willian, Olds & Cook, Ltd., Chicago, Ill., for plaintiffs.

DeWitte T. Kersh, Jr., of Tillinghast, Collins & Graham, Providence, R. I., Robert B. Frailey of Miller, Frailey & Prestia, Haverford, Pa., for defendant.

## OPINION

PETTINE, Chief Judge.

This is an action charging the defendant with infringement of United States

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The object of the invention in question is to adjust the tension on yarn being fed to a knitting machine. This is a most important goal because in knitting the quality of the fabric produced is greatly affected by the uniformity of the loops or stitches which will vary in length unless the length of the yarn per stitch is uniform. In order to accomplish such uniformity it is necessary that the knitting needles receive the yarn from the source under a very low and constant tension. It appears that throughout the history of textile manufacturing this has been an elusive trick never precisely solved,[3] especially in pattern knitting requiring varying or intermittent demands for yarn.[4]

1. There is no dispute that legal title of the patent is in the plaintiff Rosen and equitable title in plaintiff AB Iro.

2. Added as a party-plaintiff by stipulation.

3. In weaving operations the maintenance of a low and uniform tension is not as important

because it does not involve formation of stitches or loops.

4. Pattern knitting is the knitting of patterned fabrics which require the operation of a number of knitting stations (e. g., as the colors vary) thus creating intermittent demands for yarn from each station.

In simplest terms, in the past the yarn delivered to the weaving and knitting mills in large conical wrappings, referred to as "cones of yarn" or "cheeses", was threaded through an eyelet, then along a path to the knitting or weaving machine. The energy to feed this yarn to the knitting needles was supplied by the knitting needles themselves, and as a consequence the needles in the process of knitting had to overcome the drag or friction generated by the path the yarn traveled. This led to jerking and an uneven feed of yarn. Because knitting requires a very closely controlled tension—that is, the yarn strand as it is being knitted must be kept sufficiently and evenly taut—the industry developed automatic feeders which, as technologically improved, developed into intermediate yarn storing devices. However, proper tension control still was not grasped. The invention at issue relates to the combination of this storing device and a ring designed to create the required retarding or tension of the yarn.

The novelty alleged by the plaintiffs is the intermediate storage feeder with the retarding ring of the construction described in the patent.

### The Rosen Patent [5] No. 3,648,939— March 14, 1972

Though there are eleven claims, the plaintiffs are charging infringement of claims 1, 2, 3, 4, 6, 7, 8 and 9. All these except "1" are dependent claims. Accordingly this opinion will deal with the issues of claim 1 which reads:

"The embodiments of the invention in which an exclusive property or privilege is claimed are defined as follows:

1. In a yarn storing device having a storing drum adapted to have yarn wound tangentially thereon and a retarding ring surrounding the drum and adapted to have the yarn passed thereunder for removal axially from the drum, comprising the improvement wherein said retarding ring includes a base ring surrounding the periphery of the drum and spaced a small distance therefrom and a plurality of thin elongated resilient fingers extending from the base ring toward the surface of the drum, the resilient fingers being inclined inwardly from the base ring along an imaginary conical surface, said resilient fingers extending in the direction of relative rotation of the yarn during its withdrawal from the drum and disposed so as to overlap one another in the direction of the periphery of the drum, and said drum having a shoulder thereon disposed in engagement with the free ends of said resilient fingers." [6]

5. The abstract reads:

"A yarn storing device, wherein the yarn running off a bobbin can be wound tangentially onto a storing drum and can be axially removed therefrom under a retarding ring which surrounds the drum. The retarding ring comprises a base ring which surrounds the periphery of the drum at a distance and flexible, thin, elongated elements extending therefrom towards the surface of the drum. The flexible elements are formed by resilient fingers which are inclined inwards from the base ring along an imaginary conical surface and extend in the direction of relative rotation of the yarn during its withdrawal from the drum, overlap one another in the direction of the periphery and are supported by their free ends on a shoulder of the drums."

6. At the outset it should be clearly understood that the case stands or falls on claim 1 of the patent. Defense counsel flatly stated for the record, "If we don't infringe Claim 1, we don't infringe the other claims. If we do infringe Claim 1, and if it's valid, then there's no other issue in the case. . . . We can stand or fall on Claim 1." (Tr. pp. 129–130).

Figure 1 of the patent illustrates the various embodiments of the invention:

Figure 1

At this point it should be noted that the retarding ring "comprises a unitary molding of plastics material . . . provided with a base ring as well as fingers extending therefrom". It is nothing more than a simple plastic ring with so-called fingers inclined inwards and extended spirally in the direction of the relative rotation of the yarn. The circumference at the tips of the fingers is less than the circumference of the base. The circumference at the tips of the fingers is slightly less than that of the storing drum. The tension of the fingers holds the ring to the drum by creating pressure. This pressure and the spiral shaping of the fingers as described is, as contended by the plaintiffs, particularly advantageous because it results in a slight braking of the yarn as it passes from finger to finger resulting in the required tension.

Referring to figure 1, the yarn (3) runs off the bobbin (2), through the guide elements (4, 5, 6, 7), onto the storing drum (8); it is wrapped around the storing drum [7] a number of turns and then removed therefrom by coming down from the storing drum under the retarding ring (10)(11)(12); as a consequence the yarn as it is withdrawn is subjected to the tension of a series of fingers. There is a holding and releasing action as the yarn goes from one finger to the other. The next finger tends to bend slightly sideways. Tension is imparted to the yarn as it passes between the free end of the finger and the drum surface. The amount of sideways bending of the finger is a function of the amount of friction created. Any irregularity in the yarn itself that tends to increase the tension is thus compensated. This tension can be predetermined. The point is, the fingers having

a circumference less than that of the drum create a tension on the drum holding the ring on it, and since the base of the ring (as set on the drum it is the upper part of this one-piece construction) has a greater circumference than the drum, the effect is a self-adjusting activity. The fingers respond to the tug of the yarn as it passes under each little tip. These fingers are inclined so they overlap each other in the direction of the removal of the yarn. (For example, the fingers of a comb (teeth) are at right angles from the base and run parallel to each other. If these same fingers were slanted from their base they would overlap—each would overlap the vertical area occupied by its neighbor, and if this same comb was bent to form a circle it would, in a crude way, resemble the retarding ring). The motor driven storing drum pulls the yarn from the bobbin, but from the storing drum to the knitting needles the knitting machine does the pulling. This action is by design so free from tension that a tension imposing device is added so that the yarn can come off as needed at the proper predetermined tension and at the rate the knitting function demands.

Though the ring is held on the storing drums by the fingers, the yarn as it passes under the tips of the fingers creates a downward pull on the ring, and to keep it from coming off the plaintiff has a shoulder on the drum. In a crude way, the shoulder is that bulge at the very bottom of the drum that has a circumference greater than the rest of the drum, fig. 1(13).

### The Defendant's Device

The defendant's device differs in no significant way from that of the plaintiffs' excepting in the omission of the

7. There are several types of storing drums. Though immaterial to this case they are mentioned in the interest of completeness. One type has a rotating drum winding the yarn by its rotation; the other type is stationary with a winding wire wrapping the yarn around the drum. They are equivalent methods of getting the wanted supply of yarn onto the storing cone. In either case the yarn comes off the storing drum in the same manner going under a retarding ring to establish that precise limited uniform tension which the knitting machine requires.

shoulder, which the plaintiff claims only acts as a stop, and the use instead of a supporting ring to hold the retarding ring.[8] (fig. 2).

Figure 2

---

I need not discuss the retarding rings *per se* for they are identical. In fact the defendant used the retarding ring manufactured by the plaintiffs.

A multi-facted position is taken by the defense. It claims:

1. *Obviousness*—the standard for non-obviousness has not been met. (35 U.S.C. sec. 103) The defense argues that

"(a) [The plaintiffs' invention is] drawn to an old and well known com-

8. It is not material to the issues at stake that the defendant's storing drum is station-

ary and that the yarn is wound on the storing drum with a ring.

bination, the operation and results of which are unchanged and in which the individual elements all function in the usual manner. The claimed combination produces no new, unusual, surprising nor non-obvious results, but simply attempts to repatent an old combination of elements.

(b) Even assuming the old combination has been improved by defendant's substitution of a self supporting retarding ring, in place of the separately supported retarding rings previously used, such alleged improvement of one element of the old combination confers no right to repatent the old combination. Further, such alleged improvement confers no right to claim the improvement in combination with other old parts which perform no new function in the combination.

(c) In view of the state of the prior art to which the patent pertains, the subject matter of the patent as a whole was obvious at the time it was made to a person of ordinary skill in that art."

2. *Non-infringement*—it states

"Defendant's yarn storing devices utilizing yarn retarding rings of defendant's own manufacture omit the following construction, specifically required by each of the patent claims in order to render the plaintiffs' retarding rings self supporting:

> (i) a shoulder on the drum of the yarn storing device, and

> (ii) the free ends of the thin, elongated bristle-like fingers of the yarn retarding ring disposed in engagement with the shoulder to support the ring on the drum."

3. *Implied license to use and/or sell* —it contends

"(a) Defendant's yarn storing devices utilizing yarn retarding rings purchased from Wesco Distributing Corp. [AB Iro's agent] were used and sold by defendant under an implied license under the patent, in suit, and hence could not infringe the patent. Such retarding rings had no utility except for use with yarn storing devices. They were purchased by defendant before the patent in suit issued. Because such retarding rings were especially manufactured and distributed by IRO solely for use with yarn storing devices, and because Wesco, IRO's agent, sold them to defendant knowing that defendant would use and sell them with its own yarn storage devices, defendant had a license implied in law to use and/or sell those rings for the purpose for which they were specifically designed."

4. *Patent misuse*—it reasons,

" . . . plaintiffs' plastic yarn retarding ring is an unpatented element of the patented combination. No claim of the patent is directed to plaintiffs' yarn retarding ring per se. It is fundamental law that an unpatented article is in the public domain, and competitors are free to copy and sell it without liability to its originator. Public policy encourages free competition in the sale of unpatented articles, even though a competitor's article is identical to the original."

5. Plaintiffs failed to disclose in the prosecution of their patent relevant prior art which was well known to them. (Defendant's brief).

### The Combination

In this case the plaintiffs' combination uses a unitary plastic molded, self supporting retarding ring with resilient fingers surrounding the drum which in its construction and operation differs from retarding rings previously used. The claim is not a mere combination of a yarn storing device and yarn retarding ring but rather a combination of a storing drum and the ring in question which as a whole constitutes an "improvement invention". The plaintiffs look to the yarn storage device as invented in combination and do not direct any claim to the yarn retarding ring in isolation. The plaintiffs readily concede that such ring has no utility standing alone and that its patentability is only as part of

the combination because in such combination it cooperates in such a way with the drum surface as to improve the operation of the combination thus producing a new and unusually beneficial result which was not previously obtained nor was it obvious.

The defendant argues that "[e]ven assuming that the old combination has been improved by plaintiffs' substitution of their plastic molded self-supporting yarn retarding ring for retarding rings previously used, such alleged improvement of one element of the old combination confers no right to repatent the combination . . . such alleged improvement confers no right to repatent such improvement in combination with the other old parts which perform no new function in the combination." (Defendant's post trial brief, p. 93).[9] "A patent which merely repatents an old combination of elements, each performing its known and expected function, and which *produces no new nor unexpected result* is invalid." (Emphasis added, *id.*, p. 90).

In other words, the defendant is saying retarding rings are old and have been used in combination with storing devices, also old, to achieve yarn tension and that such combination produces no "new" or "unexpected" result because "that has always been the purpose of yarn retarding rings". (*Id.*, p. 94)

In making such an argument the defendant seeks that a very restrictive interpretation be applied to the words "new" and "unexpected" which is not supported by decisional law or logic.

■ The mere fact we have old concepts—retarding rings and storing drums—is immaterial. In order to be patentable the result produced by a combination of old elements need not be one that has no relationship to the prior

art, but may rather be founded upon its marked improvement over prior art by employing the same elements so as to produce a beneficial result never previously attained. *See Carnegie Steel Co. v. Cambria Wire Co.*, 185 U.S. 403, 445–446, 22 S.Ct. 698, 46 L.Ed. 968 (1902).

Support for the patentability of a combination of old elements can be found even before the enactment of 35 U.S.C. sec. 103 in *Great Atlantic and Pacific Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L. Ed. 162 (1950). This case " . . . supports patentability where the combination produces 'unusual or surprising consequences.' " *Reeves Instrument Corp. v. Beckman Instruments Inc.*, 444 F.2d 263, 271 (9th Cir. 1971) ("*Reeves*").

*Reeves* dropped the distinctions in combinations and looks directly to the question of obviousness. It applies sec. 103 according to its terms.

In 1941 this very circuit recognized this proposition in *B. F. Sturtevant Co. v. Massachusetts Hair and Felt Co.*, 124 F.2d 95 (1st Cir. 1941), *cert. denied*, 315 U.S. 823, 62 S.Ct. 917, 86 L.Ed. 1219.

This case involved a so-called "inlet vane" devised by the patentee which in and of itself was not patentable, but as adjusted and arranged in a vane controlled centrifugal fan resulted in a combination patent, which by reason of such arrangement produced a new result. The objective of the patent was not to prevent others "from using any form of vane controlled centrifugal fan", but rather "to prevent others from using such a fan with inlet vanes" that were substantially similar. *Id.*, p. 96. The patent was found valid and infringed. Judge Woodbury, writing for the court distinguished the very cases cited by the defendant. *See* n. 9, *supra*.

9. The defendant cites *The Bassick Manufacturing Company v. The R. M. Hollingshead Company*, 298 U.S. 415, 56 S.Ct. 787, 80 L. Ed. 1251 (1936); *Lincoln Engineering Company v. Stewart-Warner Corporation*, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008 (1939); *Avery Products Corporation v. Morgan Adhesives Company*, 496 F.2d 254 (6th Cir. 1974).

The distillation of all this leaves us with the question whether the plaintiffs' invention is a combination non-obvious to one of ordinary skill in the art producing a new and beneficial result not previously obtained.[10] In this case it is that unique uniform tension which made possible the knitting of fine fabrics of a quality constantly pursued by the industry but never before achieved.

*Obviousness in a Combination Patent*

The question of obviousness requires the court to make factual determinations, based on the evidence of the prior art, whether or not there is a difference from the prior art, and then rule as a matter of law in resolving the ultimate question of patentability.

The obvious, non-obviousness test was put into proper focus by the Ninth Circuit Court of Appeals in *Reeves Instrument Corp. v. Beckman Instruments, Inc., supra.* It offers the precise guidance to be applied in this case. There, as at bar, the primary contention was that the patent claims were invalid for obviousness as defined in 35 U.S.C. sec. 103 because the claimed invention consisted of elements which " . . . operat[ed] within the claimed combination in the same fashion as they [had] always operated in the prior art." *Id.,* p. 270.

In deciding this question the *Reeves* court reviewed the three controlling precedents of *Great Atlantic and Pacific Tea Co. v. Supermarket Equip. Corp., supra; Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 864, 15 L.Ed.2d 545 (1966); and *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969).[11]

In the *Great Atlantic and Pacific Tea Co. v. Supermarket Equip Corp., supra,*

as I have already pointed out, decided before the enactment of 35 U.S.C. sec. 103, the court enunciated a very stringent test in considering a combination patent comprised of old elements. It did not find invention since the old elements in the combination patent it was considering operated in the same fashion as in the prior art; however, the *Reeves* court concluded that this case cannot be used for the proposition that a combination patent is invalid because all of the elements in the combination are old. On the contrary it found, as I stated, *supra,* "It supports patentability where the combination produces 'unusual or surprising consequences.'" I quite agree. And this reading of *Great Atlantic* is made in full realization that the Court did not enunciate the non-obviousness requirements as set forth in 35 U.S.C. sec. 103, which is the law today that sets forth the indicia for "patentability". We look to the Code, as explained in *Graham v. John Deere, supra* 383 U.S. at page 17, 86 S.Ct. at p. 694, which involved a combination patent of old elements, decided following the enactment of 35 U.S.C. sec. 103,

"Under § 103 the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined."

In 1969 the United States Supreme Court again considered the question in *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., supra,* which involved a combination patent made up of old elements, and it reaffirmed the position it had taken in *Graham v. John Deere, supra.*

10. "A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter *as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject

matter pertains . . ." 35 U.S.C. sec. 103 (emphasis added); also a patent must be shown to be "new" and "useful", 35 U.S.C. sec. 101; and possess novelty, 35 U.S.C. sec. 102.

11. 35 U.S.C. sec. 103 was enacted in 1952.

With this test in mind I will now consider the prior art.

## GIFT PATENT No. 2,838,933

This is a device for the prevention of the snarling of twisted yarn as it is withdrawn from a supply package. It is a circular disc of resilient material made of a flat flexible substance such as rubber with long and short slits impaled downwardly over the yarn package. The flexible tongs rest on top of the yarn package itself.

The defendant argues it has importance in several respects, namely,

a) the ring is described in the patent as "resilient";

b) it rested on the package of yarn;

c) the fingers themselves held the supporting ring and rested in a conical way;

d) as the package got smaller the fingers moved inwardly to maintain a constant pressure on the yarn as it was withdrawn.

In answer to the court's question, in argument, why the defendant didn't employ the ring, counsel stated because it put its yarn tensioning ring on a drum. I concluded from this that the *Gift* ring cannot be used on a drum as in the patent in suit, and if it was, the results would be unsatisfactory. Positive support for this conclusion can be found in the tests performed by the plaintiffs' expert. He stated that because the *Gift* ring has fallen into disuse he constructed one and tested it on the defendant's storing device. The results were entirely unsatisfactory (Plaintiffs' exhibit 7 at page 8).

Though the *Gift* patent recites a "resilient" ring, it is devoid of all the other factors comprising the patent at issue. It lacks uniformity of fingers acting in the same fashion as the *Rosen* ring; it has no self-centering floating action, and the tension created is not uniformly low and constant. The ring tension is dependent on the size of the package which, as it diminishes, causes the tension to vary.

I see the evidence as the expert testified, *i. e.* the *Gift* patent with its long and short slits accomplished nothing more than a progressive wiping action of the fingers along their length. A lengthwise action of this type is a far cry from the finger action of the *Rosen* patent.

## SARFATI PATENT No. 3,225,446

This is one of the four patents cited by the U. S. Patent Office. It does disclose a concept of a yarn retarding ring in combination with a yarn storing device having an integral shoulder on the drum to prevent the retarding ring from being drawn off the lower end of the drum surface. Like the *Rosen* patent in suit, when the yarn is withdrawn from the *Sarfati* device it passes between the retarding ring and its shoulder support.

However, the testimony discloses *Sarfati* was originally for shuttle looms and used in weaving mills. It has not been utilized in the knitting industry. The ring is a solid rubber band which to my mind in no way responds to the *Rosen* ring. It creates exaggerated tensions, in that, if there is a knot in the yarn it lifts that section of the solid ring creating an output yarn tension peak. In no way does it accomplish the objective of the individual resilient fingers of the *Rosen* ring. If this patent is of interest it can only be as it refers to the manner in which the rubber band is mounted and to the shoulder on the drum.

Its whole concept, operation and produced results are markedly different from the *Rosen* patent in suit. Indeed, the defendant readily conceded in argument that *Sarfati* is not a "terribly important reference."

## PFARRWALLER (3,411,548), MULHAUSLER (3,490,710), NOTON (12,321) PATENTS AND THE SULZER YARN RETARDING RING

In *Pfarrwaller* we have bundles of bristles; *Mulhausler* has a "plush" ring of fabric having a fiber "pile" extending

inwardly. Both these patents have separate external supports; however, the *Pfarrwaller* ring is self-centering. *Sulzer* is nothing more than a modification of *Pfarrwaller*, and *Noton*, dating back to 1885, cited by the Patent Office, is simply another brush type ring.

As to these patents I feel I need only discuss *Sulzer*, which the defendant argues fully anticipates the *Rosen* ring, reciting for his position the testimony of the plaintiffs' expert.[12]

I do not agree with the defendant that the brush ring of *Sulzer* is so significant because I cannot equate bristles, plush fabrics, brushes or the like to the resilient fingers of the *Rosen* patent. The dramatic difference is the inability of any of these prior inventions to accomplish the treatment of individual fin-

12. "Doctor, incidentally, in the Sulzer Brush —" which is slight modification of *Pfarrwaller*, Pfarrwaller probably designed this brush, ". . . you have clumps of thin, resilient elements extending inwardly from the base ring to the drum of the device, do you not?" "Yes." "We have groups of bristles extending inward, yes, and there are spaces between those groups of bristles, are there not?" "Yes." "And do these groups of bristles extend in the direction of rotation of the yarn during its withdrawal from the drum?" "Yes." "And are those groups of bristles inclined inwardly to the drum along the surface of an imaginary cone?" "Yes." "And, as the yarn is withdrawn, does it pass under the tips of those groups of bristles?" Answer: "It does." Question: "And as the yarn is withdrawn, does it pass from one discreet clump of bristles to another discreet clump of bristles?" Answer: "It passes from large groups of bristles to large groups of bristles, yes."

"Does each individual clump of bristles of the Sulzer device act individually as a group on the yarn as it is withdrawn?" Answer: "Yes, each individual group acts individually." Question: "In the same way that each individual finger of the IRO device acts on the yarn as it is withdrawn?" Answer: "Not in the same way. It is a difference between a brush and a comb."

"Now, how close can you get, your Honor? We say the only difference is that these are more in the form of little filaments rather than individual fingers, but except for that, your Honor, and except for the floating, this ring is exactly like the ring of the Rosen patent; that's why we say it's for all practical purposes the full equivalent. Now, what is lacking is the floating, the floating, your Honor, and we have that in Muhlhausler and you ask me to compare Pfarrwaller—"

THE COURT: "Now, describe the Muhlhausler patent, and I will come to that."

Mr. FRAILEY: "Mulhausler, instead of having bristles or groups of bristles or series of bristles which would be in the form of a brush—"

THE COURT: "You have a pile or plush?"

Mr. FRAILEY: "It has a pile or plush, that is, my carpeting on the floor, for example, or the imitation fur fabrics, if you have seen them. Plush are individually closely packed filaments which extend from a basic fabric, and in the case of Pfarrwaller, this ring, instead of having inwardly extending elements, plush elements of fingers or bristles, has instead a coating of plush fibers on the inside of the ring. It's a substitution of one type of flexible means for another, one type of resilient means for another. A filament is, by the way, only designed to apply a retarding or braking action on the yarn as it passes from the drum down through the eyelet down here, the yarn consuming machine. Now, in the case of Pfarrwaller the ring is loosely mounted on the support. Dr. Wignall testified that in said Pfarrwaller, I'm sorry, in the case of Muhlhausler the ring is loosely mounted on the support with the capacity to move radially relative to the drum, with the capacity to float, and we have Dr. Wignall's testimony to that effect, which I can find, if your Honor wishes. So while Sulzer, Pfarrwaller, lack the capacity to float, we do find it in Muhlhausler's patent. Incidentally, your Honor, there's nothing in the claims about this, neither the claims for the specifications nor the drawing of the patent in suit say anything about the device being self-centered or floating. This is testimony from Dr. Wignall based on his observation, examination and testing of the commercial device of the parties. But he did not anchor that testimony anywhere, and I mean anywhere in the patent in suit, but if it's there, it's in the prior art, that's why the Sulzer ring, if your Honor please, is so relevant, everything is here, everything is here called for in that claim except this is supported externally instead of on the shoulder, on the drum, and the yarn retarding or breaking [*sic*, braking] element extends from the ring instead of being single form are in clumps of filaments." (As taken verbatim in part from post-trial argument transcript, pages 20–23.)

gers on the yarn and thus provide a uniform tension. The tests conducted by the plaintiffs' expert clearly proved that these brush and brush-like devices could not produce low uniform tension. It is clear such prior art only produced a continuous pressure by bristles of various lengths. Though Dr. Wignall did testify that the thread passes under each clump of bristles and acts on the yarn he also stated it is not done in the same manner as the *Rosen* ring. As he said, it is the difference between a "brush and a comb". N.12, *supra*. This, of course, is the singular difference. Brush rings didn't work—the defendant himself tried them and gave up.

In considering the floating action the defendant looks to *Mulhausler* as significant prior art. It is true the *Mulhausler* ring was loosely mounted, but it is equally true it does not get a self centering effect; loose mounting is of no consequence in and of itself. The engagement of yarn with plush or bristles is not the same as the engagement of the *Rosen* individual fingers in combination with a storing drum. One hardly need be an expert to see the contradictions in trying to liken a fabric or brush bristles to the individual nip and tuck of the individual fingers of the *Rosen* ring as the yarn passes from finger to space to finger in uniform rapid fashion. Without this, loose mounting adds nothing.

In concluding the discussion of the prior art the following general findings in summary form further emphasize the uniqueness of the *Rosen* ring in suit:

a) Clumps of bristles are not "thin elongated resilient fingers" as recited in claim 1.

1) the *Rosen* fingers are individual elements—described at Column 3, lines 5 and 6, as having a certain width.

2) as the testimony established groups of bristles act cumulatively and not individually and produce only pressure or clamping and not individual adjustment between bristles. They tend to form a continuous brush.

3) the brush clumps of *Noton* and *Sulzer* do not curve along a conical surface and furthermore are not placed relative to each other as in *Rosen*.

b) In the *Rosen* patented device there exists individual flexible elements spaced from each other with gaps in between them so they can act independently. That is, each finger is called upon to exert its own pressure unlike bristles, where individual action is lacking. (It's hit or miss as to which bristle or grouping of bristles will act on the yarn at any particular point.) As Dr. Wignall testified, this action acts independently on every one or two millimeters of yarn and gets 95% of its tensioning from the pressure of each tip and the yarn bending around each tip.

## SAVI RING

■ The defendant urges that the *Savi* ring is particularly important prior art contending that the only difference between *Savi* and Claim 1 of the patent is the shoulder on the drum with a retarding ring having its fingertips engaged with said shoulder. The *Savi* ring consisted of a base ring surrounding the periphery of the storage drum with flexible thin longitudinally extended elements of elastic bristle-like fingers. The reasoning as to this patent is no different from that of the other brush type rings discussed, *supra*. During post-trial arguments defendant's counsel was asked if it was not true the *Savi* ring lacked the trick of individual finger action of the *Rosen* ring in suit. His only response was that if such is the novelty of the *Rosen* invention it is not in the claim, the drawings or the file history and further is contrary to the disclosure of the patent. Counsel admonishes this court it cannot rewrite the claim. The essence of this position is that the patent discloses the yarn as always being under a finger with a constant pressure and does not go in the

space between the fingers for individual finger action. This position holds no water. Claim 1 of the patent defines the structure and the inherent advantages flowing from such structure need not be specifically mentioned. *Rehrig Controls Co. v. Maxitrol Co.*, 253 F.Supp. 896 (E.D.Mich.1966).

> "A patentee may be baldly empirical, seeing nothing beyond his experiments and the result; yet if he had added a new and valuable article to the world's utilities, he is entitled to the rank and protection of an inventor. And how can it take from his merit that he may not know all of the forces which he has brought into operation? It is certainly not necessary that he understand or be able to state the scientific principles underlying his invention, and it is immaterial whether he can stand a successful examination as to the speculative ideas involved." *Diamond Rubber Co. v. Consolidated Rubber Tire Co.*, 220 U.S. 428, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911).

In *Rehrig Controls Co. v. Maxitrol Co., supra,* the court held it was immaterial that the patent did not mention an inherent characteristic of the construction. *See also Reese v. Elkhart Welding & Boiler Works,* 447 F.2d 517 (7th Cir. 1971).

I believe these authorities fall foursquare on the case at bar. It is unmistakable that where thread is passed successively under individual fingers as in the patent in suit it must go in the spaces between the fingers and it cannot and will not act in same fashion under a solid ring. To acknowledge the conspicuous is not rewriting the patent; to ignore it is to do violence to the justice and common sense of it all.

Finally the defendant argues that the *Rosen* patent No. 3,419,225 is the most relevant prior art next to *Savi.* It points to the similarity of the shoulder on the drum, the motor which causes the drum to rotate, the manner in which the yarn moves downwardly and the base ring of the yarn retarding ring.

Though the defendant admits that *Rosen,* 3,419,225 uses a "C" ring as a tensioning device which is far different from the *Rosen* ring at issue, it defends on the ground it is not the "C" ring which is important, but rather what the patent states, *i. e.,* as an alternative the "C" ring can be eliminated and in its place substitute a ring which rests on the shoulder of the drum. (Column 4 of the patent.) The only difference then, it contends, would be the lack of fingers 'which are old in the art. I find this approach overly simplistic. It does nothing more than say to put fingers on a solid ring as Mr. Rosen did in the patent before the court was obvious—that it was obvious to do the very thing which eluded the whole industry from at least 1885 (*Noton*).

### *Failure to Disclose Prior Art*

The defendant argues that the plaintiffs failed to disclose relevant prior art to the Patent Office and as a consequence their entire patent is invalidated, citing *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 818, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 176, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). *See also Minnesota Mining & Manufacturing Co. v. Norton Co.*, 280 F.Supp. 674 (N.D.Ohio 1967); *Beckman Instruments, Inc. v. Chemtronics, Inc.*, 428 F.2d 555 (5th Cir. 1970); *Strong v. General Electric Company*, 305 F.Supp. 1084 (N.D.Ga.1969). The prior art it refers to is *Rosen U. S. Patent No. 3,419, 225;* the 1964 and 1967 *Savi* yarn storing devices; and the 1967 *Sulzer* yarn storing device.

The initial question, of course, is whether any of these patents are indeed anticipatory of the patent at issue.

> "There has been no showing that under any statute, or rule of the Patent Office, or professional custom, or canon of ethics there is any explicit or implicit obligation resting upon an ap-

plicant for a patent or his solicitor to disclose to the Patent Office all the materials which he has used in evolving the invention he claims. [citations omitted] . . .

Of course, a putative inventor must disclose any printed publication which he either knows or believes describes the very invention claimed [citations omitted]. More than this, if he knows of a printed publication which plainly describes his claimed invention or comes so close thereto that every reasonable man would say the invention claimed was not original but had been anticipated, then regardless of his personal view, that he is the original inventor, he will not be excused for his failure to disclose his knowledge. But the applicant has no duty to cite every publication of which he knows, or which he has used, merely because the publication is one likely to be referred to by a vigilant examiner in the Patent Office, or by a rival in an interference or other proceeding. It is not the object of the quoted statute or rule to supply all available evidence to the Patent Office, or to force the applicant to set up what he regards in good faith as straw men which he reasonably and in good faith believes he can knock down." *United States of America v. The Standard Electric Time Company*, 155 F.Supp. 949, 951 (D.Mass.1957), *appeal dismissed*, 254 F.2d 598 (1st Cir. 1958). *See also Canaan Products, Inc. v. Edward Donn & Company*, 273 F.Supp. 492 (E.D.Ill.1966); *RPTZ–Patco., Inc. v. Pacific Inland Navigation Company*, 253 F.Supp. 796 (D.Or.1966). *See also Wen Products, Inc. v. Portable Electric Tools, Inc.*, 367 F.2d 764 (7th Cir. 1966).[13]

The *Savi* and *Sulzer* publications are not significant as prior art because their contributions, if any, over *Pfarrwaller*, cited to the Patent Office, are insignificant. The defendant does not recognize the vitality of the plaintiffs' device that the claims are drawn to an improvement invention presenting evenly spaced individual fingers operating independently. At bar we have a combination of a retarding ring and a storing drum which has a diameter related specifically to the dimensions of the retarding fingers on

13. I quite agree with the plaintiffs' argument as recited in their brief stating,

"The case law cited by defendant is simply not in point on the facts of the present case. In *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945) there was extensive perjured testimony given in an interference proceeding in the Patent Office. In *Walker Process Equipment Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L. Ed.2d 247 (1965), the patent applicant had publicly used the patented device more than one year before his application for patent and then swore before the Patent Office that no such bar to patentability existed. In *Minnesota Mining & Manufacturing Co. v. Norton Co.*, 280 F.Supp. 674 (N.D.Ohio 1967), the Court found that a reference with which the patent applicant was intimately familiar and which disclosed an essential feature of the applicant's invention (but was not anticipatory) had not been disclosed to the Patent Office. Nevertheless, the Court *did not* find that the patent was invalid for such non-disclosure. In *Beckman Instruments, Inc. v. Chemtronics Inc.*, 428 F.2d 555 (C.A.5, 1970) a prior public use device was brought to applicant's attention and one of his patent liaison people wrote a memorandum to the effect that this prior art device clearly fell within the claims of the patent application (invalidated them). The applicant intentionally avoided making either the device or the aforementioned opinion known to the Patent Office. In *Strong v. General Electric Co.*, 305 F.Supp. 1084 (N.D.Ga., 1965) a prior publication *of the patent applicant* which *anticipated* several of the claims of a patent had not been disclosed to the Patent Office. In *Borden Inc. v. Occidental Petroleum Corp.*, 182 U. S.P.Q. 472, 381 F.Supp. 1178 (S.D.Texas 1974); the patent applicant advised his attorney that a specific prior art patent was the most pertinent to the applicant's process. Nevertheless, the attorney did not advise the Patent Office of the prior art patent and, in fact, specifically argued before the Patent Office that a claimed chemical range shown by the prior art patent was not present in any prior art. This was a clear misrepresentation." (Plaintiffs' · answering post-trial brief, p. 52.)

the ring. They cooperate and produce a vastly improved result. For the same reasons and as discussed, *supra,* I give no significant weight to defendant's argument relative to *Rosen* 3,419,225. However the defendant's attempt to belittle the *Rosen* device, it seems clear to this court that, in retrospect, his improvement was the magic difference between failure and success. True, the purpose of plaintiffs' combination device is no different than such as was sought for and accomplished in part by devices employed in the past. However, its ultimate achievement is well described in the following quote:

> "It should be borne in mind that this process was one not accidentally discovered, but was the result of a long search for the very purpose. The surprise is that the manufacturers of steel, having felt the want for so many years, should never have discovered from the multiplicity of patents and of processes introduced into this suit, and well known to the manufacturers of steel, that it was but a step from what they already knew to that which they had spent years in endeavoring to find out. It only remains now for *the wisdom which comes after the fact* to teach us that Jones discovered nothing, invented nothing, accomplished nothing.

We cannot better conclude this opinion than by the following extract from the opinion of Mr. Justice Bradley in *Webster Loom Co. v. Higgins,* 105 U.S. 580, 591, 26 L.Ed. 1177, 1181: 'But it is plain from the evidence, and from the very fact that it was not sooner adopted and used, that it did not, for years, occur in this light to even the most skillful persons. It may have been under their very eyes; they may almost be said to have stumbled over it; but *they certainly failed to see it, to estimate its value, and to bring it into notice* . . . Now that it has succeeded, it may seem very plain to anyone that he could have done it as well. *This is often the case with inventions of the greatest merit.* It may be laid down as a general rule, though perhaps not an invariable one, that if a new combination and arrangement of known elements produce a new and beneficial result, never attained before, it is evidence of invention.' " *Carnegie Steel Co. v. Cambria Wire Co., supra,* at pp. 445–446, 22 S.Ct. at 715 (emphasis added).

In like fashion the U. S. Supreme Court in *Diamond Rubber Co. v. Consolidated Rubber Tire Co.,* 220 U.S. 428, 435, 31 S.Ct. 444, 447, 55 L.Ed. 527 (1911), stated:

> "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than subtle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

This very circuit made the same point in *S. D. Warren Co. v. Nashua Paper Co.,* 205 F.2d 602, 604–605 (1st Cir. 1953):

> "It is usually, if not indeed always, easy to discover a genesis somewhere for any patentee's contribution. A thought expressed here, a hint appearing there and a suggestion made somewhere else can always be found, after the event, and assembled to support the contention that what the patentee did was really nothing but what anyone else might do if so inclined. But if patents were to be held invalid on such reasoning few would survive. Even the greatest invention of all time, the wheel, had, we are told, its prior art of unnumbered savages slip-

ping on round stones. How many slipped before some bruised genius among them literally fell upon the principle of the roller, and how many more years, or centuries, passed before some succeeding genius, building upon the prior art of rollers, thought of a fixed pivot and invented the wheel, can only be surmised."

The question remains whether these differences from the prior art give rise to patentability. "[T]he level of ordinary skill in . . ." this art must be resolved.

"It is difficult to set forth any meaningful quantitive evaluation of the level of skill in a given art. Rather, such determination can be made only by an analysis of the problem allegedly solved by the invention and the efforts of others to arrive at a satisfactory solution. In this respect, the Supreme Court has noted that '[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc. might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.'" *Reeves, supra* at pp. 271–272 (citations omitted).

This statement is exquisitely applicable to the patent in suit. Prior to the *Rosen* invention there were no yarn storing devices capable of delivering that uniform tension necessary to the production of high quality fabric. Since the present patent has been on the market (1969) Iro has had sales totalling $41,000,000.00. Ninety-five per cent were sold to textile manufacturers for use on knitting machines. In the U.S. alone sales totalled $19,100,000. to some of this country's largest manufacturers.

The defendant vigorously argues that such commercial success is devoid of any

probative value because the plaintiffs had six patents, and it cannot be said that the recited sales are attributable only to the patent in issue, and furthermore an arbitrary date of 1969 was taken by the plaintiffs thus obscuring commercial sales prior to said date which may have been as great.

The defendant misreads the testimony. It shows that sales in the United States went from $900,000. in 1970–1971 to $5,800,000. in 1971–1972 to approximately $8,000,000. in 1972–1973. During the same time period, worldwide sales were going from $3,000,000. in 1970–1971 to $16,000,000. in 1972–1973. The date of the patent shows that the increase in sales was directly attributable to the patent in suit. Indeed there was testimony (Dr. Kinkeldey) directly on this point to the effect that the commercial success of the feeder was directly attributable to the yarn retarding ring in question.

As to commercial success Judge Rich [14] states:

"[A]s a judge, if I were presented with a defense of obviousness and the evidence showed that the defendant, long knowing about a problem in his product or his manufacturing process for which he had found no solution, changed over to use his competitor's patented invention as soon as he heard of it, I would not call that evidence secondary and ignore it in considering his argument that it was an obvious invention."

This is particularly apropos to the case at issue, for here the defendant copied the plaintiffs' invention and now argues it was obvious all the time. I find this position rather difficult when it is realized the defendant used, not a ring similar to the plaintiffs', but rather the very ring manufactured by the

---

14. "Laying the Ghost of the 'Invention' Requirement", Judge Giles S. Rich, U.S. Court of Customs and Patent Appeals, is a most persuasive substantive analysis of the subject. It is a scholarly oration on 35 U.S.C.

sec. 103 delivered to the Patent Law Association of Los Angeles and San Francisco on September 18 and 20, 1972, and published in Volume 1 at page 24 of the American Patent Law Association Journal (1972).

plaintiffs—the very part of the combination the defendant could not master.

It cannot be denied the claim involved in this case was an improved invention which proved to be the touchstone of success in accomplishing the theretofore elusive uniform tension which is indispensable to high quality knitting.

Throughout the history of the textile industry efforts were focused toward uniform tension in knitting machines. This was especially difficult to achieve because of damaged or faulty yarn packages. When a knot or faulty section of the package was reached as the yarn was withdrawn tension variations occurred. Manufacturers marketed many devices without success because they could not master the trick of controlling the yarn. In all the prior art, the many rings and drums used were unsuccessful. I need not reiterate their differences and failings. Rosen responded to the problem and solved it and Lawson-Hemphill, because of its own frustrations, has infringed, as will be discussed, *infra*. Its imitation of the *Rosen* patent is a tribute to the patentability of the invention in question.

If the difference delineating the distinction of the patent at issue from the prior art was so obvious and trivial as the defendant would have us believe, then it was senseless to copy the plaintiff's invention when all it had to do was use the prior art. As Judge Hough wrote in *Kurtz v. Belle Hat Lining Co.*, 280 F. 277 (2d Cir. 1922):

"The imitation of a thing patented by a defendant, who denies invention has often been regarded, perhaps especially in this circuit, as conclusive evidence of what the defendant thinks of the patent, *and persuasive of what the rest* of the world ought to think." *Id.* at p. 281; *see also Colgate-Palmolive Co. v. Carter Products, Inc.*, 230 F.2d 855 (4th Cir. 1956).

■ This court finds the asserted claims 1–4, 6–9 of the *Rosen* patent are valid.

*Implied License and Patent Misuse*

The defendant contends that the plaintiffs' retarding ring is an unpatented element of the patented combination and is, therefore, in the public domain to be ". . . made and sold by whoever choses to do so". *Sears, Roebuck & Co. v. Stiffel Company*, 376 U.S. 225, 231, 84 S.Ct. 784, 789, 11 L.Ed.2d 661 (1964); *Campco Corp. v. Day-Brite Lighting Inc.*, 376 U.S. 234, 84 S.Ct. 779, 11 L. Ed.2d 669 (1964). It is contended that the misuse and implied license stems from the plaintiffs' refusal to sell to the defendant any of its rings, in that, the sale of the unpatented plastic yarn retarding rings is conditioned on the sale and use of its patented yarn storage feeders. Specifically the defendant states that by restricting the sale of the ring to "customers who use their patented device" the plaintiffs unlawfully restrain competition and misuse their patent.[15]

■■ The law is quite clear that a patentee cannot restrain competition by conditioning the sale of an unpatented article on another's right to use his patented invention. Here the plaintiffs cannot condition the defendant's right to use their patented invention upon the defendant purchasing the ring from it. *Mercoid Corp. v. Minneapolis-Honeywell*, 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396 (1944); *Mercoid Corp. v. Mid-Continent Co.*, 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944).

15. As will be discussed defendant also argues that the sale of the unpatentable retarding rings to it by plaintiffs' agent constituted an implied license for defendant to employ the retarding ring in its storing device. If this court were to accept both of defendant's positions it can readily be seen that plaintiffs, the patent holders, would be left in an untenable position, *i. e.* faced with the choice of exposing themselves to a claimed anti-trust violation for refusal to sell the retarding ring or the prospect of diluting the value of their patent by selling the ring independently.

"The fact that an unpatented part of a combination patent may distinguish the invention does not draw to it the privilege of a patent . . . However worthy it may be, however essential to the patent, an unpatented part of a combination patent is no more entitled to monopolistic protection than *any* other unpatented device. For as we pointed out in *Mercoid v. Mid-Continent Investment Co., supra, a patent on a combination is a patent on the assembled or functioning whole, not on the separate parts.*" (emphasis added.) *Mercoid Corp. v. Minneapolis-Honeywell, supra* at p. 684, 64 S.Ct. at 280.

This quotation must be viewed in the context of the existing factual situation. There the patented system could not be used unless an unpatented switch which was part of the combination patent was bought from the patentee and used in the system.

■ In this case it cannot be denied that the plaintiffs had a policy to restrict the sale of their yarn retarding rings to use solely on their storage feeder and instructed their agents not to sell otherwise. However, this does not fall within the ambit of the foregoing cited authorities. Though they refuse to sell there is no prohibition against the defendant *or anyone else from manufacturing and marketing a similar ring and selling it to the plaintiffs' customers,* nor is there any evidence that the plaintiffs grant licenses to use the patented invention only on condition that the licensee purchase the retarding rings from them. They do not seek to control competition in the sale of the unpatented ring. They do not say the retarding ring can only be used on their feeder, nor do they say that their feeder cannot be used unless the retarding ring is bought from them. This stand was affirmed by the plaintiffs in argument to this court. In this case it is the entire patented combination which the plaintiffs seek to protect. They seek to protect the production and use of their ring in such a way as constitutes infringement.

■ Defendant further argues it had an implied license to use and sell, with its storing device, the plaintiffs' retarding ring. It premises this contention on the ground that the plaintiffs' retarding rings used by it were purchased from the plaintiffs' authorized distributor and that since such rings have no other use except in a yarn storing device it has the right to use and sell them.

"An incident to the purchase of any article, whether patented or unpatented, is the right to use and sell it, and upon familiar principles the authorized sale of an article which is capable of use only in practicing in the patent is a relinquishment of the patent monoply with respect to the article sold." *United States v. The Univis Lens Co.*, 316 U.S. 241, 249, 250–251, 62 S.Ct. 1088, 1093, 86 L.Ed. 1408 (1942). *See also Davis v. Hall Mammoth Incubator Co.*, 200 Fed. 958, 959 (1st Cir. 1912).

The short answer is, though that is the law, it finds no factual support in this case. I find the facts to be as argued by the plaintiffs: defendant was specifically refused the purchase of the retarding ring in question from the plaintiffs by Mr. Rosen himself and that subsequent thereto the defendant went to the plaintiffs' United States agent and, without revealing Mr. Rosen's earlier refusal, the defendant purchased a limited supply of the rings. When the plaintiffs discovered this, they instructed their agent to stop selling to the defendant. This does not constitute a sale so as to grant an implied license.

"A person with notice of a limitation of an agent's authority cannot subject the principal to liability upon a transaction with the agent if he should know that the agent is acting improperly." Section 166, *Restatement of the Law of Agency.*

## 550

### Infringement

■ At the outset I find that the defendant's yarn storing feeder includes all of the elements of each of Claims 1–4 and 6–9 with the exception of the shoulder. As a consequence, the infringement issue centers about this "shoulder" on the plaintiffs' yarn storing drum. In the plaintiffs' device, as has already been described, its purpose is to prevent or stop the retarding ring from being pulled off the drum. The defendant's device does not have a shoulder but rather a support ring.

As this court stated in *Shields-Jetco, Inc. v. Torti*, 314 F.Supp. 1292, 1299 (D.R.I.1970):

"It is well established law that it is fatal to a charge of infringement if the accused device omits a single element of a claim without inclusion of an equivalent.

It was held in *Steigleder v. Eberhard Faber Pencil Co.*, 81 F.Supp. 143, 145 (D.Mass.1948), aff'd, 176 F.2d 604, (1st Cir.), cert. denied, 338 U.S. 893, 70 S.Ct. 244, 94 L.Ed. 548 (1949):

'The question of whether or not there is infringement must be decided with reference to the claims of the patent which "measure the invention" (Paper Bag Patent Case, [*Continental Paper Bag Co. v. Eastern Paper Bag Co.*], 210 U.S. 405, 419, 28 S.Ct. 748, 751, 52 L.Ed. 1122), for it is in the claims that the inventor has set forth his own statement of what precisely his invention is. *White v. Dunbar*, 119 U.S. 47, 52, 7 S.Ct. 72, 30 L.Ed. 303.'

In Deller's Walker on Patents (2d Ed. 1965), § 246 at page 129, it is stated:

'The claims must be read in the light of the disclosure of the specification, not to restrict the invention to the precise structure disclosed, but to grasp the invention in order properly to measure the range of equivalents.' Citing in footnote, *Flowers v. Magor Car Corp.*, 65 F. 2d 657 (3rd Cir. 1933).

At page 131 we find:

'But a claim is not required to be limited to exact devices disclosed by the specification and drawings since the claims of the patent and not its specifications measure the invention.' Citing in footnote, *Cates v. Camp*, 83 F.2d 111 (4th Cir. 1936) and *Flowers v. Austin-Western Co.*, 149 F.2d 955 (7th Cir. 1955)."

The question is whether or not the support ring of the defendant's invention is the full equivalent in all respects of the shoulder of the plaintiffs' patent, and this also requires I consider whether or not "file wrapper estoppel" exists, limiting the range of equivalents upon which the plaintiffs rely.

The standard has been well established in *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.*, 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), where the Court stated at pages 607–609, 70 S.Ct. at page 855:

"In determining whether an accused device or composition infringes a valid patent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it.

But courts have also recognized that to permit imitation of a patented invention which does not copy every literal detail would be to convert the protection of the patent grant into a hollow and useless thing. Such a limitation would leave room for—indeed encourage—the unscrupulous copyist to make unimportant and insubstantial changes and substitutions in the patent which, though adding nothing, would be enough to take the copied matter outside the claim, and hence outside the reach of the law. One who seeks to pirate an invention, like one who seeks to pirate a copyrighted book or play, may be expected to introduce minor variations to conceal

and shelter the piracy. Outright and forthright duplication is a dull and very rare type of infringement. To prohibit no other would place the inventor at the mercy of verbalism and would be subordinating substance to form. It would deprive him of the benefit of his invention and would foster concealment rather than disclosure of inventions, which is one of the primary purposes of the patent systems.

The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent. Originating almost a century ago in the case of *Winans v. Denmead,* 15 How. 330, 14 L.Ed. 717, it has been consistently applied by this Court and the lower federal courts, and continues today ready and available for utilization when the proper circumstances for its application arise. 'To temper unsparing logic and prevent an infringer from stealing the benefit of the invention' [1] a patentee may invoke

[N. 1. L. Hand in *Royal Typewriter Co. v. Remington Rand,* 2 Cir., 168 F.2d 691, 692.]

this doctrine to proceed against the producer of a device 'if it performs substantially the same function in substantially the same way to obtain the same result.' *Sanitary Refrigerator Co. v. Winters,* 280 U.S. 30, 42, 50 S.Ct. 9, 13, 74 L.Ed. 147. The theory on which it is founded is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form or shape.' *Machine Co. v. Murphy,* 97 U.S. 120, 125, 24 L.Ed. 935.

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. . . . Consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform. An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was."

Claim 1 speaks of a drum ". . . having a shoulder thereon disposed in engagement with the free ends of said resilient fingers." The specification language tells us that the resilient fingers are supported on the shoulder. The claim in the patent at issue is obviously to prevent the retarding ring from being drawn off the drum. It seems to me it is inescapable that the support ring in the defendant's invention is to serve the same function, and if this is all the shoulder does then the doctrine of equivalents is applicable because substantially the same function is performed in substantially the same way by the defendant's support ring. The only quaere is whether the same results are obtained. The defendant contends this must be answered in the negative in that the shoulder of the plaintiffs' patent forces the yarn outwardly between the resilient fingers whereas his device does not. With all due respect, in my considered opinion it is sheer sophistry to rest on this contention. Even if this is so, it in no way changes one iota the function of the patent at issue. However, I find on the basis of the testimony no difference in tension control is produced between the plaintiffs' and defendant's devices; the comparative tests of the plaintiffs' expert prove it. As the plaintiffs argue, there is no difference in either the intended or actual function by use of either an integral shoulder, as in the patent at issue, or an external support ring, as in the defendant's invention.

The plaintiffs' expert, Dr. Wignall, was totally convincing in emphatically

**552**

stating and reasoning that they both did the same work in substantially the same way to achieve the same results. On the basis of the evidence I so find.[16]

16. Because of the technical nature of this discussion the following quotes of Dr. Wignall's testimony seem appropriate:

"I said in my report that they both act in substantially the same way, they both move down from the storage drum, there is a varying degree of centrifugal force, they move into the area of the tension ring, they fall down to the tension points, some tension applies by air current by drag, and they would move in the area of nip of clamp tension, then I'm quite sure, because of the rapid lateral movement of the yarn that there is some lateral action against the point at each side, and this then causes the hold of the tension and it insures that every finger acts independently. What happens after it leaves the fingers is not really of any consequence because the work has already been done."

Question: ". . . comparing the shoulder and the supporting ring, that is, one has a shoulder, one has a supporting ring, and referring to the supporting ring as against the shoulder, can it be said insofar as these two devices are concerned that the Lawson-Hemphill device performs substantially the same function and in substantially the same way to obtain the same results?"

THE WITNESS: "It's an emphatic yes, sir."

THE COURT: "Your answer is yes?"

THE WITNESS: "Yes."

THE COURT: "In other words, the two devices, the IRO device and the Lawson-Hemphill device, do the same work in substantially the same way and accomplish substantially the same results?"

THE WITNESS: "Yes, sir."

THE COURT: "Do you have any reservations about that affirmative answer?"

THE WITNESS: "No, sir, I maintained that position before I came."

THE COURT: "Do you have any reservations about that answer?"

THE WITNESS: "I have no reservation whatsoever, sir."

THE COURT: "And on what do you base this categorical position that you take, as concisely, but yet as fully as you can?"

THE WITNESS: "Yes, both of the rings where they do their work are constructed with the same materials, that have various similar dimensions, that have a similar tension ring and that are both self-centered or floating, and they both apply independent action from independent finger to each tiny section of the yarn as it passes through the device. The unwinding is the same, there's been some point made about one is rotating, one is stationary, but generally speaking it doesn't matter whether it's rotating or not, if it's coming off the bobbin it will come off with practically zero tension. I think it almost comes off—"

THE COURT: "You're saying that at that speed it doesn't matter whether it's rotating or not in fact rotating?"

THE WITNESS: "There is nothing in my opinion, there may be some dispute about the amount of ballooning, there may be perhaps practically minimum ballooning, but there's no disputing that at 450 revolutions per minute it's impossible to find outward forces acting on the yarn to take it away from the drum. So as we move into the funnel formed by the flexible elements it doesn't really matter whether it's thrown to the outside with great force or no force, it comes spiraling down to a very low angle within the points and then gently compressing, and then moves under one finger to give a clamping action and then the rapid movement laterally of the thread remembering it's still running at this speed, gives a lateral action on it so we get this change of angle, and coming down to this, and we get this bending tension I talked about, and both in my view act in exactly the same way and have a similar construction and I get identical results. Now, we have the shoulder of Rosen with its support ring, we have the ring of Lawson-Hemphill, which is also present, and the yarn path, after leaving the tips of the fingers, it may go outward, it may go straight down, but the work is done, in any view, and I tell you why I don't think the yarn works against the shoulder, because if you lift it only half a millimeter it's off the drum, if you move it laterally it's off the drum. So in all of my tests I can't find any difference in the results. If I look at the ring I can't find any difference in the construction of the ring, other than a slightly broader base ring at the top, and I can't find any difference to make substantially any change in the results, and the results show that I do get very similar, well, identical results. . . . there is the main friction elements, the pressure at the end of the fingers and the other limits, the bending tension, because it bends around the corner, it comes spiraling down, a low angle, then it's taken axially so that means it bends and it has bending friction, if the finger doesn't move, then you get it in excess, I'm bound to get those two tensions, it's those two tensions that give this individual action and produce the uniformity, because the uniformity is a by-product, because if you get an excessive pull or a slight tug, it is then the fingers move laterally to ease the thread

This leaves the question whether file wrapper estoppel denies the plaintiffs the range of equivalency necessary to encompass the defendant's device.

"The substance of file wrapper estoppel is that where a patentee has narrowed his patent claim in response to a rejection of the Patent Office, in order to obtain issuance of a patent, he is estopped from resorting to equivalents with respect to those limitations which were so introduced. See e. g. *Bishman Mfg. Co. v. Stewart-Warner Corp.*, 380 F.2d 336 (7th Cir.), cert. denied 389 U.S. 897, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967)." *Shields-Jetco, Inc. v. Torti, supra*, at pages 1299–1300.

The claims at issue were not narrowed in response to any rejection by the Patent Office. They are of the same scope as originally filed, and so no file wrapper estoppel exists at bar.

I find the structures identical, and since the defendant used or sold his device after March 14, 1972, the date of the patent in suit,[17] it has infringed the plaintiffs' patent.

Therefore, it is concluded as a matter of law:

1. That legal title of the patent is in the plaintiff Rosen and equitable title in plaintiff AB Iro, n. 1, *supra*;

2. That the claims of the *Rosen* patent in suit are good and valid in law;

3. That the defendant has infringed the claims of the *Rosen* patent in suit.

Judgment is hereby rendered for the plaintiffs on their complaint. The question of accounting and attorneys' fees is stayed pending appeal.

An order will be prepared accordingly.

---

through, and it does that with both devices." (Vol. 6 transcript, pp. 105–108, 110. Verbatim quote.)

